

Signed December 13, 2012.

_____

Ronald B. King
United States Chief Bankruptcy Judge

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| LISA ANN GALAZ, | § | CASE NO. 07-53287-RBK |
| | § | |
| DEBTOR | § | CHAPTER 13 |
| _____ | § | |
| | § | |
| LISA ANN GALAZ | § | |
| | § | |
| VS. | § | ADVERSARY NO. 08-5043-RBK |
| | § | |
| RAUL GALAZ, ALFREDO GALAZ, | § | |
| SEGUNDO SUENOS, LLC | § | |
| | § | |
| VS. | § | |
| | § | |
| JULIAN JACKSON | § | |

### OPINION ON DAMAGES

In 2007, Lisa Ann Galaz ("Debtor") filed a petition under Chapter 13 of the Bankruptcy

Code. On April 22, 2008, Debtor brought this adversary proceeding against her ex-husband, Raul

Galaz ("Galaz"); his father, Alfredo Galaz ("Alfredo"); and Segundo Suenos, LLC ("Suenos")[1]

(collectively, "Defendants").  Julian Jackson ("Jackson") was joined as a third-party defendant,

asserting his claims in concert with Debtor.  Debtor's claims arose from Galaz's fraudulent transfer

of the assets of Artist Rights Foundation, LLC ("ARF") to Suenos in June 2005.  ARF was a

California limited liability company formed by Galaz and Jackson in which Debtor and Jackson held

ownership interests.  The primary contention of Debtor and Jackson (the "Claimants") was that the

Defendants defrauded them of the value of royalties to the music of the recording group, The Ohio

Players (the "Royalties"), which ARF acquired and held as its primary asset until the fraudulent

transfer occurred.

On November 12, 2010, the Court found that the transfer of assets from ARF to Suenos was

invalid, that it constituted a fraudulent transfer under the Texas Uniform Fraudulent Transfer Act,

and that Galaz breached the fiduciary duties he owed to Jackson and ARF.  (Case No. 08-5043, ECF

No. 344)  The Court set aside the transfer from ARF to Suenos and affirmed ownership of ARF to

be as follows: 50% to Jackson, 25% to Debtor, and 25% to Galaz as an economic interest only.  The

Court awarded actual and exemplary damages to the Claimants, and the Defendants subsequently

appealed to the United States District Court for the Western District of Texas.  (Case No. 08-5043,

ECF No. 347)

On April 19, 2012, the Honorable Harry Lee Hudspeth, United States District Court, Western

District of Texas, issued a Memorandum Opinion upholding the decision of the Court on the merits

[1]Although not apparent from the record, "Segundo Suenos" was most likely formed with the intention of reading "Segundo Sueños," which is Spanish for "Second Dreams."  This Opinion will use the spelling used by the entity itself.

2

of the case, but vacating the damage awards and remanding the case for reconsideration of the awards of actual and exemplary damages.  The District Court stated:

> The Bankruptcy Court provided no explanation as to how it calculated actual damages, and it is unclear whether the Court considered Segundo Suenos's expenses and found them unreliable or if the expenses were not taken into consideration at all.  Thus it is impossible for this Court to conduct a meaningful review of the calculation of actual damages . . . .

(Case No. 08-5043, ECF No. 484)

Because the award of exemplary damages "appear[ed] to be based upon the finding of actual damages," that award was vacated as well.  Accordingly, in addition to the Opinion entered on November 12, 2010, the Court hereby makes the following findings and conclusions under Rule 7052 with regard to actual and exemplary damages.

## FACTS

Galaz graduated from law school in 1988 and began practicing law in California, specializing in entertainment law at various law firms.  Jackson was a music producer.  After the two met, Galaz became Jackson's attorney and business partner.  In 1998, the two formed ARF to collect unpaid royalties of the Ohio Players.  Raul was to contribute his expertise as an entertainment and copyright lawyer, and Jackson had a relationship with one of the members of the band.  Together, Galaz and Jackson successfully secured all rights to the Ohio Players' music catalogue.  Initially, the Royalties did not generate any revenue.

In May 2002, Debtor and Galaz divorced and executed an agreement (the "Divorce Decree"), which stipulated that Galaz was to assign one-half of his 50% interest in ARF to Debtor, leaving both Debtor and Galaz with a 25% ownership interest in ARF.  Because Galaz transferred half of

3

his interest without Jackson's consent in violation of the company's written operating agreement (the "Operating Agreement"), Debtor received an economic interest only with no management or voting rights.  In October 2004, Galaz sent a letter to Jackson (the "Demand Letter"), insisting that Jackson send money to cover expenses incurred by ARF in accordance with provisions in the Operating Agreement for a capital call upon ARF's members.[2]  (Def.'s Exs. 2, 4)  Galaz claimed that he had incurred out-of-pocket expenses of over $8,500, that a tax debt of more than $5,000 existed, and that he had not been paid anything for his "services."  (Def.'s Ex. 4)  He demanded that Jackson remit $6,750 to him personally for his share of the expenses, plus an amount equal to the fair value of his services, which he described as several hundred hours at a rate of $250 per hour.  Galaz made no such demand upon Debtor and did not contribute any personal funds for his proportionate share of the expenses and taxes.

At trial Galaz argued that providing notice to Jackson of the transfer to Suenos was not necessary because Jackson's membership interest in ARF had been terminated as a result of his failure to respond to the Demand Letter or contribute his share of the expenses and taxes.  It is clear, however, that Galaz knew that the address to which he sent notice was no longer valid.  In December 2003, Jackson received a complaint in the mail, styled "Raul Galaz vs. Julian Jackson," at his correct address in Marina Del Rey, California, and a second complaint at his Nevada address.  (Def.'s Ex. 72)  Despite providing notice to Jackson at the correct address in those matters, in October 2004 Galaz sent the Demand Letter to Jackson's previous address listed in the Operating Agreement in

---

[2]Section 2.1 of the Operating Agreement provided that, in addition to an initial cash contribution to ARF, additional contributions to the capital of ARF would be required of its members in amounts sufficient to maintain the business of ARF and in proportion to each member's ownership interest in the company.  (Def.'s Ex. 2)

4

Los Angeles, California.  (Def.'s Exs. 2, 4)  As was fully intended by Galaz, Jackson never received the letter or remitted any money to Galaz.  (Def.'s Ex. 72)  Furthermore, Galaz knew the letter would not result in the notice actually reaching Jackson because Galaz was aware that Jackson no longer resided at that address.  The two were pitted against one another in litigation immediately prior to the transfer, and this was expressly referenced in the letter.  (Def.'s Ex. 4)

On June 3, 2005, Galaz fraudulently transferred all of ARF's rights to Suenos by way of a three-page document titled "Agreement of Assignment and Transfer of Assets of Artist Rights Foundation, LLC, (California)."  (Def.'s Ex. 23)  At the time of the transfer, Suenos was not organized as a business entity under the laws of any state.  On September 28, 2005, three months after the transfer, Galaz assisted his father in filing the documents required to establish Suenos as a limited liability company ("LLC") with the state of Texas.  (Pl.'s Ex. 9)  Galaz did not inform the Claimants of the transfer or otherwise obtain their consent.  The terms of the transfer purportedly obligated Alfredo and Suenos to pay the liabilities Galaz recited in the Demand Letter:  Galaz's out-of-pocket expenses, expenses for Galaz's "services," and the past-due California franchise taxes. The Royalties soon began to generate a substantial amount of revenue.  From the time of transfer to the time of trial, Suenos's gross revenue from the Royalties totaled nearly one million dollars, but all of the money was paid to the Defendants, with the Claimants receiving no share of the profits despite their ownership interests in ARF.

After making the fraudulent transfer, Galaz wrongfully dissolved ARF by filing a Certificate of Cancellation with the California Secretary of State on December 27, 2006. (Def.'s Ex. 5) Galaz's

5

dissolution was wrongful because the Articles of Organization and the Operating Agreement specifically listed events which, upon their occurrence, required the dissolution of the company.[3] (Def.'s Exs. 1, 2)  None of those conditions were met when Galaz dissolved ARF.[4]  Because ARF was wrongfully dissolved without any notice to Jackson, there was no winding up of its affairs as contemplated by the Operating Agreement.  (Def.'s Ex. 2)  As a result of Galaz's wrongful dissolution, ARF ceased its active existence as an LLC, and the assets of ARF have devolved to the individual owners of the company.  (Case No. 08-5043, ECF No. 344)

This Court set aside the transfer to Suenos and awarded damages to the Claimants on three different theories: (1) the transfer from ARF to Suenos was invalid; (2) the transfer violated the Texas Uniform Fraudulent Transfer Act ("TUFTA"); and (3) Galaz breached the fiduciary duties he owed to Jackson and ARF.  The District Court affirmed the holding of the Court on all three theories. At issue is the amount of damages awarded to the Claimants for the Defendants' fraudulent transfer and breach of fiduciary duty with respect to Jackson.

---

[3]The Operating Agreement provided that dissolution was to occur upon the death, withdrawal, resignation, retirement, insanity, bankruptcy, or dissolution of any member.  (Def.'s Ex. 2) It continued to define certain conditions of dissolution, which included: (1) the aforementioned events; (2) the entry of a decree of judicial dissolution pursuant to the California Corporate Code; (3) a vote of members holding at least 51% of the membership interests; or (4) the sale of all or substantially all of ARF's assets.  (*Id.*)

[4]The purported transfer from ARF to Suenos did not constitute the sale of all or substantially all of the company's assets because the Operating Agreement did not authorize the transfer without approval of the majority of membership interests and Galaz did not provide notice to Jackson, whose vote of approval for the transfer was necessary.  Because Debtor's membership interest in ARF at that time was economic only, she did not have the voting rights necessary to approve or disapprove a sale of ARF's assets.  (Def.'s Ex. 2)

6

ANALYSIS

1.      ***Actual Damages Based on the Value of the Ohio Players Royalties***.

TUFTA creates a statutory cause of action through which a creditor may seek recourse for a fraudulent transfer.  *See* TEX. BUS. & COM. CODE ANN. § 24.005 (Vernon 2009).  TUFTA authorizes both equitable relief, through the avoidance of a fraudulent transfer, and money damages up to the value of the property transferred.  ***Wohlstein v. Aliezer***, 321 S.W.3d 765, 776 (Tex. App.–Houston [14th Dist.] 2010, no pet.) (citing ***Chu v. Hong***, 249 S.W.3d 441, 446 (Tex. 2008)).  Specifically, the remedies for a fraudulent transfer under TUFTA include: (1) avoidance of the transfer to the extent necessary to satisfy the creditor's claim; (2) an attachment or other provisional remedy; (3) other equitable remedies such as injunctions or the appointment of receivers; or (4) any other relief that the circumstances may require.  TEX. BUS. & COM. CODE ANN. § 24.008(a); ***Airflow Houston, Inc. v. Theriot***, 849 S.W.2d 928, 933–34 (Tex. App.–Houston [1st Dist.] 1993, no writ).  "The last option is quite broad."  ***Airflow***, 849 S.W.2d at 934.

The Claimants are entitled to relief in the amount of the value taken by the Defendants in order to restore the Claimants to the position they would have occupied had the fraudulent transfer never occurred.[5]  *See* ***Asarco LLC v. Ams. Mining Corp***., 404 B.R. 150, 170–73 (S.D. Tex. 2009) (stating that the court can award an amount of damages necessary to put a claimant in the financial condition in which it would have been before the fraudulent transfer took place).  A court has wide discretion to approximate the value that a claimant has lost as a result of a defendant's fraudulent transfer of assets.  *See* ***West v. Hsu*** (***In re Advanced Modular Power Sys***.), 413 B.R. 643, 678

---

[5]Because the assets of ARF have devolved to the individual owners of the LLC, any relief granted will be to the owners of ARF in their individual capacities.

7

(Bankr. S.D. Tex. 2009) (citing *Asarco*, 404 B.R. at 162) (stating that it is within the discretion of the court to award relief in the amount of value taken by a defendant). In awarding damages based upon the value of the asset transferred, a court may adjust the award "as the equities may require." TEX. BUS. & COM. CODE ANN. § 24.009(c)(1). With these principles in mind, the Court will determine the amount of value lost by the Claimants, adjusted equitably according to the circumstances of the case.

The Royalties did not begin to generate *revenue* until after the transfer occurred, but this does not mean they did not have value. Rather, a determination of the value of the Royalties must take into account their potential to generate revenue in the future. Because the Royalties generated a significant amount of income after the transfer, equity requires an adjustment of value to reflect the revenue they generated between the time they were fraudulently transferred to Suenos and the date the Court nullified the transfer. *See id.* Galaz testified that the total income generated by the Royalties was $988,000, which included revenue from royalties owned by ARF, a one-time sale of royalties to Bridgeport Music, Inc., dividend and interest income, and contributions by Alfredo Galaz, the ostensible owner of Suenos. (Trial Tr., 49, Feb. 23, 2010) Alfredo testified that Suenos received $998,000 from the rights during that time period. (Trial Tr., 237, Feb. 23, 2010) A twelve-page document titled "Segundo Suenos Income/Expenses (from inception thru 12-1-09)" (the "Expense Report") was admitted into evidence which listed the total revenue received by Suenos from the Royalties at $968,529.17, dividend income of $401.91, and interest income of $386.85 (Pl.'s Ex. 14A; Def.'s Ex. 49) In light of the conflicting evidence, the Expense Report is the most reliable indicator of the revenue received by Suenos. Using the figures in the Expense Report, the

8

total value of the Royalties as evidenced by the income they generated for Suenos including interest and dividend income totals $969,317.93. *Id*.

In the prior Opinion, this Court restored the Royalties to ARF and affirmed the ownership of ARF as follows: a 50% interest held by Jackson, a 25% interest held by Debtor, and a 25% interest held by Galaz as an economic interest only.[6] Because the Claimants lost the benefit of their ownership interests from June 2005 until November 2010, they are entitled to their proportionate share of the $969,317.93 in gross income generated by the Royalties during that period of time. Accordingly, Jackson's share of the revenue totals $484,658.97 and Debtor's share totals $242,329.48, less allowable expenses. These amounts will be used as a starting point to determine the amount of value that the Claimants were deprived of as a result of the fraudulent transfer.

a. ***Valuation of the Royalties Considering Reasonable and Necessary Expenses***.

Galaz argued that the Court improperly disregarded evidence of $694,642.57 in expenses that should have been factored into the valuation of the Royalties.[7] A review of the Expense Report is therefore necessary to determine whether the equities of the case compel a reduction in the valuation based on the expenses incurred by ARF or Suenos. At the outset it is important to note that ARF, as a wholly distinct entity from Suenos, is not liable for the debts, liabilities, or obligations that were incurred by *Suenos*. ARF was an LLC that was formed under the laws of California and owned by Jackson, Debtor, and Galaz. On the other hand, Suenos is an LLC that was formed under the laws of Texas and owned by Alfredo Galaz. Because the Expense Report reveals expenses which were

---

[6]Jackson has consented to Debtor's ownership of ARF as a full member. (Pl.'s Ex. 68, 69)

[7]As the document used to determine revenue, the Expense Report should also be used to determine expenses. The Expense Report lists the total expenses of Suenos at $694,642.57. (Def.'s Ex. 49)

9

incurred *after* the date of the transfer by a wholly distinct entity formed for the purpose of defrauding the Claimants of their share of revenue, the expenses of Suenos will not be factored into a determination of the value of the Royalties. *See* ***Advanced Modular Power Sys.***, 413 B.R. 643, 679 (Bankr. S.D. Tex. 2009) (declining to reduce damage award in breach of fiduciary duty and fraudulent transfer case where doing so would reward wrongdoers for their actions). As owners of ARF, the Claimants would be responsible for their proportionate share of reasonable and necessary expenses that were incurred by *ARF* prior to the date of the transfer. Accordingly, the equities of the case require that a calculation of the Royalties should take into account any such expenses. Because the assets of ARF have devolved to the individual owners of the LLC, any expenses properly attributable to ARF prior to the transfer will be reflected by a reduction in the damage awards to the Claimants.

i. ***Franchise Taxes Incurred by ARF Prior to the Fraudulent Transfer***.

Two letters from Galaz to the California Franchise Tax Board on behalf of ARF purport to include payment of past-due franchise taxes from the year it was registered as an LLC in 1998 through the year of the fraudulent transfer in 2005, although the letters did not evidence actual payment. (Def.'s Exs. 61, 63) Two bank account statements for Suenos, however, were admitted into evidence that reflect payments of $9,376 and $1,508.05 to the California Franchise Tax Board in amounts matching those recited in the letters.[8] (Def.'s Exs. 62, 64) If the fraudulent transfer had never occurred, ARF would have still owed its unpaid California franchise taxes between 1998 and

---

[8]The letters and bank account statements also reflect a payment for ARF's franchise taxes for the year 2006. No reduction in value should be applied from this payment because it was incurred after the date of the fraudulent transfer in an effort to defraud ARF and its members of revenue. Therefore, the 2006 tax payment is outside of the scope of expenses that may equitably be attributed to ARF.

10

2005.  Suenos paid a total of $10,884.05 for ARF's tax liabilities between 1998 and 2005.  The members of ARF are therefore liable for their share of ARF's unpaid franchise taxes during that period of time.

ii.    ***Expenses in the Expense Report of Suenos***.

The Expense Report does not reflect any expenses that were incurred prior to the date of the transfer.  (Def.'s Ex. 49)  Additionally, there were no regularly-kept profit and loss statements or balance sheets for Suenos.  (Trial Tr., 250-52, Feb. 25, 2010))  Further, Defendants neither offered nor presented any evidence of invoices, receipts, work orders, or other documentation to support or explain the transactions in the Expense Report.  Accordingly, there was insufficient evidence to prove the existence, reasonableness, or necessity of the expenses in the Expense Report.  Without sufficient proof of the existence, necessity, or reasonableness of any of the expenses in the Expense Report, equity does not compel them to be considered in determining the value of the Royalties.  Regardless, the Court will review the Expense Report to support this conclusion.

Defendants claimed that a substantial portion of the revenue was used to pay legal fees incurred in obtaining the Royalties.  The Expense Report lists the total amount of legal and professional fees incurred at $331,968.38; however, no evidence was presented to establish that the legal fees were incurred to obtain the Royalties.  (Def.'s Ex. 49)  Payments totaling $125,000 went to the law firm of Pick & Boydston.  ***Id***.  Pick & Boydston represented Galaz in a number of lawsuits, only one of which appears to be directly related to the acquisition of the Royalties.  *See* ***Segundo Suenos, LLC v. Satchell***, Nos. B213178, B213251, 2009 WL 4646145 (Cal. App. 2d Dist. 2009), *cert. denied*, 131 S.Ct. 164 (2010).  Two other lawsuits in which Pick & Boydston represented Galaz and one of his former entities had nothing to do with the acquisition of the

11

Royalties.  In *Galaz v. Jackson*, No. B184916, 2006 WL 648852 (Cal. App. 2d Dist. 2006), Galaz engaged Pick & Boydston to bring suit against Jackson to enforce an illicit money laundering agreement in connection with royalties that Galaz illegally acquired to the television show "Garfield and His Friends."[9]  Further, in *Worldwide Subsidy Group v. Bogert*, No. B213979, 2009 WL 4609258 (Cal. App. 2d Dist. 2009), one of Galaz's former entities retained Pick & Boydston to assert a legal malpractice action that was held to be barred by the statute of limitations.  In addition to the lack of evidence showing that these expenses were reasonable or necessary, the Expense Report failed to specifically identify the matters for which the payments to Pick & Boydston were made.  Moreover, by examining the time frame in which the fees were paid after the transfer between 2006 and 2009, in conjunction with entries showing payments to "James S. Wilk...," "Jackson Walk...," "Clerk, U.S. Ba...," "Federal Court...," and "Pacer," it appears that a substantial portion of the revenues were used to pay for Galaz's legal fees incurred in defending this lawsuit.  *See* Case No. 08-5043, ECF Nos. 67, 106.  In light of the inability to determine whether any legal and professional

---

[9]       Raul Galaz, having successfully defrauded owners of a television program of a large amount of royalty payments, entered into an illegal money-laundering contract with . . . Julian Jackson.  Under their oral agreement, Galaz would give Jackson $59,000 in illicit royalty proceeds, which Jackson would place in an offshore bank account and return the funds in untraceable cash to Galaz, less a five percent commission for himself.  Jackson, however, eschewed the commission and kept the cash.  Galaz, aggrieved to find so little honor among thieves, sued Jackson for rescission and fraud.

. . . .

As our courts have long recognized, an illegal contract may not serve as the foundation of *any* action, either in law or in equity.  This state's courts are not in the business of helping criminals recover the proceeds of their fraudulent schemes.

*Galaz v. Jackson*, 2006 WL 648852, at *1 (Cal. App. 2d Dist. 2006).

fees were reasonable or necessary in order to generate revenue from the Royalties, the Defendants did not establish that a reduction in valuation for these expenses is equitable.

Furthermore, the Expense Report contains multiple other categories of expenditures that were not proven or otherwise shown to have been reasonable or necessary for the generation of revenue. For example, $48,785.08 was spent on "Auto" expenses, including $42,000 for a Hummer sport utility vehicle for Galaz's personal use, $79.40 to register the Hummer, $2,568.42 for service on the vehicle, $820 for car washes at the "Wash Tub," and $1,843.26 in fuel.  (Def.'s Ex. 49)  The Expense Report also reveals that Galaz paid himself $48,619.22 in "Consulting Fees," and that $174.70 was spent on "Dining," for meals at Outback Steakhouse, Carrabba's, and Fatty's. *Id*. A total of $77,155.16 was paid in "Rent" to Ruth Galaz and Shantell Sloan.  It is unclear whether this rent was paid for personal or commercial use; however, because Shantell Sloan is Raul Galaz's wife and Ruth Galaz is his mother, the legitimacy of these expenses was not established.  The Expense Report further reveals that $12,124.73 was spent on "Travel," $10,000 on a loan to "Amado Ramos Phone Cente...," and a number of transfers that were made between multiple accounts at multiple banks.

The Defendants also claimed that consideration should be given to $420,000 that Galaz allegedly incurred for his legal services on behalf of ARF.  These purported expenses will not be considered because the Defendants failed to present any contemporaneous evidence specifically showing what services Galaz provided, whether those services were provided before or after the fraudulent transfer, or whether they were reasonable or necessary.  At no point in time did Galaz ever present any bills to ARF for his legal services.  (Trial Tr., 217, Feb. 25, 2010)  In any case, Galaz would not be entitled to any fees for legal services after 2002 because he forfeited his law license

13

that year.  (Pl.'s Ex. 12)  *See Cruse v. O'Quinn*, 273 S.W.3d 766, 772 (Tex. App.–Houston [14th Dist.] 2008, pet. denied).

Because the evidence failed to show that any of the expenditures in the Expense Report or those for Galaz's legal services were reasonable or necessary, equity does not compel a reduction in valuation of the Royalties to reflect these transactions.  Moreover, the existence of a number of clearly illegitimate expenses in the Expense Report renders reliability of the expenses tenuous, at best.  Accordingly, this Court declines to consider these expenses because to do otherwise would be to indirectly countenance the Defendants' improper conduct.  *See* TEX. BUS. & COM. CODE ANN. § 24.009(c)(1) (Vernon 2009) (damage award for value of property transferred "subject to adjustment as the equities may require").

b.      ***Assessment of Actual Damages Based on Value of the Royalties***.

The value of the Royalties at the time of the transfer, as adjusted to reflect the revenue they generated between the date of the fraudulent transfer and the date the Court nullified the same, yields an initial valuation of $969,317.93.  An equitable reduction in value will be applied to reflect Jackson's and Debtor's proportionate shares of ARF's past-due California franchise tax liability between the date of its inception and the date that the fraudulent transfer occurred.  The total amount of tax liability of ARF during the relevant period of time equals $10,884.05.

From 1998 until 2002, Galaz and Jackson were the sole members of ARF, each with a one-half ownership interest in the company.  After the Divorce Decree in 2002, ownership of ARF was split between Jackson, Galaz, and Debtor in 50%, 25%, and 25% economic-only interests, respectively.  Therefore, in order to accurately determine the proportion of tax liability owed, it is

14

necessary to calculate the tax liability incurred from 1998 to 2002 separately from the liability incurred from 2003 to 2005.

There was insufficient evidence to determine the amount of yearly tax liability incurred by ARF between 1998 and 2005.  In light of the Court's equitable power to determine the true value of the Royalties, the yearly amount will be calculated pro rata by dividing the total amount of unpaid taxes over the entire eight-year period from 1998 to 2005.  Therefore, the yearly pro rata tax liability of ARF equals $1,360.51.  After totaling this amount for the two relevant periods of ownership of ARF, the company incurred a total of $6,802.53 in liability from 1998 to 2002, and a total of $4,081.52 in liability from 2003 to 2005.  Galaz and Jackson, as the two sole members of ARF from 1998 to 2002, are liable for the tax liability incurred during that time in proportion to their respective 50% interests.  Thus, Galaz and Jackson are each responsible for $3,401.26 of ARF's tax liability from 1998 to 2002.  For the period of time from 2003 to 2005, Jackson is responsible for $2,040.76 of the taxes and Debtor and Galaz are each responsible for $1,020.38, in accordance with the parties' respective ownership interests in ARF.

In total, the members of ARF are responsible for tax liabilities incurred from 1998 until 2005 in the amounts as follows: Jackson for $5,442.02, Debtor for $1,020.38, and Galaz for $4,421.64. Because the Claimants must account for their proportionate share of the taxes, the actual damage awards to Debtor and Jackson will be reduced by their respective obligations.  Accordingly, Jackson is entitled to actual damages of $479,216.95, and Debtor is entitled to actual damages of $241,309.10.  Because the Defendants failed to show that any further reduction of the value of the Royalties was reasonable or necessary, equity does not compel an adjustment of the amount of actual

damages for the expenses incurred by the Defendants after attempting to defraud Jackson and Debtor of their share of the revenues.

2.     ***Exemplary Damages Based on Fraud, Malice, and Gross Negligence***.

A bankruptcy court may rely on state law to award exemplary damages where the Bankruptcy Code does not specifically allow such measures.  ***Franklin Bank, S.S.B. v. Barnes*** (***In re Barnes***), 369 B.R. 298, 310 (Bankr. W.D. Tex. 2007); ***Smith v. Lounsbury*** (***In re Amberjack Interests, Inc***.), 326 B.R. 379, 391 (Bankr. S.D. Tex. 2005).   Under Texas law, courts of equity have the power to assess exemplary damages.  ***Id***.  As a court of equity, a bankruptcy court may assess exemplary damages where state law supports such an award.  ***Id***.  Furthermore, exemplary damages are proper in order "to punish the defendant for outrageous, malicious, or otherwise morally culpable conduct." ***Transp. Ins. Co. v. Moriel***, 879 S.W.2d 10, 16 (Tex. 1994).  In addition to punishing a wrongdoer, exemplary damages serve to deter others from engaging in similar conduct.  ***Owens-Corning Fiberglass Corp. v. Malone***, 972 S.W.2d 35, 40 (Tex. 1998).

Exemplary damages may be awarded only where the plaintiff proves by clear and convincing evidence that the loss or injury results from: (1) fraud; (2) malice; or (3) gross negligence.  *See **In re Barnes***, 369 B.R. at 310 (citing Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (Vernon Supp. 2012)).  The Texas Civil Practice and Remedies Code defines fraud as "fraud other than constructive fraud." Tex. Civ. Prac. & Rem. Code Ann. § 41.001(6) (Vernon 2008).  Malice is defined as "a specific intent by the defendant to cause substantial injury or harm to the claimant." Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7).  Specific intent means that "the actor desires to cause the consequences of his act, or that he believes the consequences are substantially certain to result from it." ***Mission Res., Inc. v. Garza Energy Trust***, 166 S.W.3d 301, 314 (Tex. App.–Corpus Christi

16

2005), *rev'd on other grounds*, 268 S.W.3d 1 (Tex. 2008).  Further, gross negligence is defined as an act or omission:

> (A)  which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (B)  of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) (Vernon 2008).

Based upon the evidence presented at trial, the Claimants have proven that they were harmed by the Defendants' acts of gross negligence, malice, and fraud based in connection with the Defendants' breach of fiduciary duty and fraudulent transfer of assets from ARF to Suenos. Accordingly, the circumstances of this case compel an award of exemplary damages.

a.  ***Malice in Connection with the Defendants' Breach of Fiduciary Duty***.

Under the California LLC statute, a managing member owes fiduciary duties of loyalty and care to the other members of an LLC and to the LLC itself.  *See, e.g.*, CAL. CORP. CODE §§ 16404(a), 17153 (West 2006); ***Berg & Berg Enters., LLC v. Boyle***, 100 Cal. Rptr.3d 875, 890–91 (Cal. App. 6th Dist. 2009).  The duties of loyalty and care include the responsibility to account for and hold as trustee any property, profit, or benefit derived from the conduct of the business.  CAL. CORP. CODE § 16404(b)(1).  Further, the duties forbid a managing member from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law.  *Id.* at § 16404(c). Because Jackson was a co-owner of ARF with management and voting rights, a fiduciary relationship existed between Galaz, Jackson, and ARF.  Galaz breached his fiduciary duties of

17

loyalty and care through his failure to account for the property and profits derived from the business of ARF, the perpetration of an intentional fraud in an effort to secure the Royalties for his own benefit, and the wrongful dissolution of ARF after making the transfer.  In breaching his fiduciary duties of loyalty and care, Galaz acted with malice.  As a law school graduate, convicted felon, and disbarred attorney with extensive experience in entertainment law, Galaz was well aware of the impropriety of his actions.  (Pl.'s Ex. 11, 12)  By acting at all times with full knowledge of the illegitimacy of his actions, Galaz acted with a specific intent to cause harm to Jackson and ARF.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7).  Accordingly, an award of exemplary damages in favor of Jackson is proper against the Defendants for malice in connection with Galaz's breach of fiduciary duty.  *See In re Barnes*, 369 B.R. at 310 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 41.003 (Vernon Supp. 2012)).

b.   <em><strong>Fraud and Malice in Connection with the Fraudulent Transfer</strong></em>.

In accordance with Section 41.003 of the Texas Civil Practice and Remedies Code and Section 24.005(a) of TUFTA, Galaz's conduct constituted acts of fraud and malice because he made the transfer to Suenos with the actual intent to hinder, delay, and defraud the Claimants.  *See* TEX. BUS. & COM. CODE ANN. § 24.005(a) (Vernon 2009) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor.").  On appeal the District Court affirmed the finding that Galaz acted with the actual intent to defraud.  (Case No. 08-5043, ECF No. 484) Because Galaz acted with the intent to defraud,  the completed transfer of assets from ARF to Suenos constituted fraud under TUFTA.  Furthermore, Galaz acted with malice because he acted with a specific intent to defraud the Claimants of their share of revenue from the Royalties and

18

of their ownership interests in the Royalties themselves.  Therefore, an award of exemplary damages

in favor of Jackson and Debtor is proper in light of Galaz's violation of TUFTA.

          c.     ***Assessment of Exemplary Damages***.

    Under Texas law, exemplary damages are capped at the greater of: "(1)(A) two times the

amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the

[fact finder], not to exceed $750,000.00; or (2) $200,000.00."  TEX. CIV. PRAC. & REM. CODE ANN.

§ 41.008 (Vernon 2011).  "The amount awarded must be reasonably proportional to actual damages,

though no set ratio exists for measuring reasonableness.***"  Smith v. Lounsbury*** (***In re Amberjack***

***Interests, Inc.***), 326 B.R. 379, 393 (Bankr. S.D. Tex. 2005) (citing ***Alamo Nat'l Bank v. Kraus***, 616

S.W.2d 908, 910 (Tex. 1981)).  The Court weighs the following six factors in determining the

reasonableness of an award: (1) the nature of the wrong; (2) the character of the conduct involved;

(3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties

concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and

(6) the net worth of the defendant.  TEX. CIV. PRAC. & REM. CODE ANN. § 41.011(a); ***In re***

***Amberjack Interests***, 326 B.R. at 393 (citing ***Kraus***, 616 S.W.2d at 910).  Exemplary damages

awarded by the Court are "presumptively reasonable" if the award is within the statutory limits.  ***In***

***re Amberjack Interests***, 326 B.R. at 393 (citing ***Peco Constr. Co. v. Guajardo***, 919 S.W.2d 736, 742

(Tex. App.–San Antonio 1996, writ denied)).

    Under Section 41.008 of the Texas Civil Practice and Remedies Code, the Court will assess

an exemplary damage award of $500,000 in favor of Jackson and $250,000 in favor of Debtor.  TEX.

CIV. PRAC. & REM. CODE ANN. § 41.008.  These modest figures represent significantly less than a

doubling of the awards of actual damages.  Because the awards of exemplary damages are within the

statutory limits, the awards of exemplary damages are reasonable under Texas law.  Further, after a careful review of the circumstances surrounding the nature of the wrong, the character of the Defendants' conduct, the degree of the Defendants' culpability, the situation and sensibilities of the parties, and the extent to which the Defendants' conduct offends a public sense of justice and propriety, the awards of exemplary damages are reasonable under the factors set forth in Section 41.011(a) of the Texas Civil Practice and Remedies Code. *See **In re Amberjack Interests***, 326 B.R. at 393 (citing ***Kraus***, 616 S.W.2d at 910).  The actions perpetrated by the Defendants were sufficiently malicious to justify an award of exemplary damages and such an award is necessary to deter Galaz and others from engaging in similar conduct in the future.

   3.   ***Conclusion***.

   For the reasons set forth herein, the Court concludes that Jackson and Debtor are entitled to an award of actual damages in the amount of $479,216.95 to Jackson and $241,309.10 to Debtor. Further, the circumstances surrounding the Defendants' conduct were sufficiently egregious to compel an award of exemplary damages in the amount of $500,000 to Jackson and $250,000 to Debtor.  Therefore, Jackson is entitled to an award of actual and exemplary damages in the amount of $979,216.95, and Debtor is entitled to actual and exemplary damages in the amount of $491,309.10.  All proceeds attributable to Galaz's interest shall be paid to the Claimants until their damage awards are satisfied.  Debtor's attorney may submit a post judgment affidavit concerning post remand attorney's fees within fourteen days.  Judgment will be rendered simultaneously with the entry of this Opinion.

# # #