

Signed January 23, 2015.

Ronald B. King
United States Chief Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| LISA ANN GALAZ, | § | CASE NO. 07-53287-RBK |
| | § | |
| DEBTOR. | § | CHAPTER 13 |
| ———————————————— | § | |
| | § | |
| LISA ANN GALAZ, | § | |
| | § | |
| PLAINTIFF, | § | |
| VS. | § | ADVERSARY NO. 08-5043-RBK |
| | § | |
| RAUL GALAZ, ALFREDO GALAZ, | § | |
| SEGUNDO SUENOS, LLC, | § | |
| | § | |
| DEFENDANTS, | § | |
| VS. | § | |
| | § | |
| JULIAN JACKSON | § | |
| | § | |
| THIRD-PARTY DEFENDANT. | § | |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In this adversary proceeding, Lisa Ann Galaz ("Debtor")[1] alleges that Defendants fraudulently transferred certain corporate assets that should be property of the bankruptcy estate.[2]

---

[1] Since filing this adversary, Debtor has changed her last name and is now named Lisa Ann Katona.

Following remand by the United States Court of Appeals for the Fifth Circuit, and pursuant to Federal Rule of Bankruptcy Procedure 9033(d), this Court's proposed findings of fact and conclusions of law are presented below for *de novo* review by the District Court.

## I.      Relevant Background and Procedural History

In December 2007, Debtor filed a petition under Chapter 13 of the Bankruptcy Code. On April 22, 2008, Debtor initiated this adversary against her ex-husband, Raul Galaz ("Raul"); Raul's father, Alfredo Galaz ("Alfredo"); and Segundo Suenos, LLC ("Segundo Suenos")[3]. Debtor asserts, *inter alia*, that in June 2005 Raul fraudulently transferred the assets of Artist Rights Foundation, LLC ("ARF"), in which Debtor had a 25% interest, to Segundo Suenos. ARF's assets consisted primarily of the rights to the royalties from the music of the Ohio Players, a former funk band that gained prominence in the 1970s. Debtor alleges that, by transferring the assets of ARF to Segundo Suenos, Defendants defrauded Debtor of her share of income from the Ohio Players' royalties, which generated nearly a million dollars from the time of ARF's transfer in June 2005 until trial in February 2010.

On August 8, 2009, Defendants filed a Third-Party Complaint against Julian Jackson ("Julian"), who held a 50% membership interest in ARF. (ECF No. 222). Defendants alleged that Julian fraudulently attempted to obtain possession and control over Segundo Suenos' assets.

---

[2] Debtor's fraudulent transfer claim "is not the paradigmatic fraudulent conveyance claim in bankruptcy, [in which] it is the debtor who removes property from [the] estate to prevent its falling into the hands of creditors"; here, Debtor asserts that Defendants improperly transferred Debtor's property to Segundo Suenos, and thus she is a creditor of Defendants. *Galaz v. Galaz (In re Galaz)*, 765 F.3d 426, 430 (5th Cir. 2014).

[3] Although not apparent from the record, "Segundo Suenos" was most likely formed with the intention of reading "Segundo Sueños," which is Spanish for "Second Dreams." The Court will use the spelling used by the entity itself.

Julian, in turn, asserted various counterclaims, including breach of fiduciary duty and fraudulent conversion, against Defendants.[4]

On November 12, 2010, this Court rendered its Opinion that the transfer of assets from ARF to Segundo Suenos was invalid, the transfer was a fraudulent transfer under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), and Raul breached the fiduciary duties he owed to ARF and Julian. (ECF No. 344). The Court found, however, that Debtor held only an economic interest in ARF and, therefore, Raul did not owe any fiduciary duty to Debtor. Further, the Court set aside the transfer from ARF to Segundo Suenos and awarded actual and exemplary damages to Debtor and Julian. Defendants appealed to the District Court. (ECF No. 347).

On April 19, 2012, the District Court upheld this Court's judgment on the merits of the case, but vacated the damage awards and remanded the case for reconsideration of the awards for actual and exemplary damages. (*See* ECF No. 484).

On December 13, 2012, this Court rendered its Opinion on Damages and Judgment, which the District Court affirmed on August 1, 2013. (*See* ECF Nos. 495, 496, 514). Defendants then appealed to the Fifth Circuit.

In light of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), and its progeny, on August 25, 2014, the Fifth Circuit vacated with instructions for the District Court to dismiss Julian's third-party counterclaims for lack of subject matter jurisdiction. *Galaz v. Galaz (In re Galaz)*, 765 F.3d 426, 431 (5th Cir. 2014).

The Fifth Circuit also vacated this Court's judgment regarding Debtor and remanded. *Id.* at 432. Although the Fifth Circuit agreed with the District Court that Debtor's TUFTA claim was only "related to" the bankruptcy, rather than a core proceeding under 28 U.S.C. § 157(b), the

---

[4] Following remand from the Fifth Circuit, discussed *infra*, the District Court dismissed any counterclaims made by Julian in this case for lack of subject matter jurisdiction. (*See* ECF No. 524).

court held that Defendants' implied consent did not give this Court jurisdiction to render a final judgment over Debtor's TUFTA claim. *Id.* at 431-32. Additionally, the Fifth Circuit reasoned that "parties' express or implied consent cannot cure the constitutional deficiency that results from circumventing, or diminishing, the Article III structural protections for the federal judiciary." *Id.* at 432 (citing *BP RE, L.P. v. RML Waxahachie Ford, L.L.C. (In re BP RE, L.P.)*, 735 F.3d 279, 286-87 (5th Cir. 2013); *Frazin v. Haynes & Boone, L.L.P. (In re Frazin)*, 732 F.3d 313, 319 (5th Cir. 2013)). The Fifth Circuit therefore held that this Court lacked constitutional authority to enter a final judgment regarding Debtor's claims. *Galaz*, 765 F.3d at 432.

On September 24, 2014, the District Court referred the case to this Court to submit proposed findings of fact and conclusions of law for *de novo* review. (ECF No. 523).

## II.     Proposed Findings of Fact

Raul graduated from law school in 1988 and began practicing law in California, specializing in entertainment law at various law firms. Julian was a music producer. In 1998, Raul and Julian formed ARF as a California LLC. Raul contributed his expertise as an entertainment and copyright lawyer, and Julian utilized his relationship with one of the members of the Ohio Players to successfully secure rights to the Ohio Players' music catalog. Initially, the Ohio Players' music royalties did not generate any revenue.

### A.     After divorcing Raul, Debtor had only an economic interest in ARF.

In May 2002, Debtor and Raul divorced and executed an agreement, in which Raul assigned one-half of his 50% interest in ARF to Debtor, leaving both Debtor and Raul with a 25% ownership interest in ARF.

Upon divorce, Debtor's community property interest in 50% of ARF terminated, and she received her ownership share of the company by operation of the divorce decree. The divorce

decree provided that Debtor received a 25% interest in ARF, but the divorce decree was silent as to the nature of the interest.

Section 6.1 of ARF's operating agreement (the "Operating Agreement") prohibited the transfer of membership interests except "with the prior approval of all Members, which approval may be given or withheld in the sole discretion of the Members." (Def.'s Ex. 2 § 6.1). Debtor argues that by signing the divorce agreement, Raul gave his approval for Debtor to become a full member. Debtor presented no evidence, however, that Julian gave his prior approval to Raul's transfer of membership interest to Debtor. Because a valid transfer of a full membership interest required the *prior* approval of *all* members, the Court finds that Debtor did not hold a full voting membership interest as a result of the divorce agreement.

Further, section 6.3 of the Operating Agreement provided that where a transfer of interest in ARF did not meet the requirements of section 6.1, the transferee would receive a share of the net profits and losses, but could not vote or participate in management of the company.

Thus, because Raul transferred one-half of his interest in ARF without obtaining Julian's consent, the Court finds that Debtor received solely an economic interest, with no management or voting rights, in ARF.

### B.      Raul's Demand Letter did not provide notice to Julian.

In October 2004, Raul sent Julian a letter (the "Demand Letter"), in which he insisted Julian send him money to cover expenses incurred by ARF, in accordance with the Operating Agreement provisions for a capital call upon ARF's members.[5] (Def.'s Exs. 2, 4). The Court finds Julian did not receive proper notice of the Demand Letter, and the Demand Letter did not properly specify the amounts Julian allegedly owed for services or capital contributions.

---

[5] Section 2.1 of the Operating Agreement provided that, in addition to making initial cash contributions, ARF's members were required to make additional capital contributions in amounts sufficient to maintain ARF's business and in proportion to each member's ownership interest. (Def.'s Ex. 2).

First, Raul knew that the address to which he sent the Demand Letter was no longer valid. Before sending the letter, Raul and Julian were pitted against one another in litigation; Raul expressly referenced this litigation in the letter. (Def.'s Ex. 4). In December 2003, Julian received a complaint in the mail, styled "Raul Galaz vs. Julian Jackson," at his correct address in Marina Del Rey, California; Julian received a second complaint at his Nevada address. (Def.'s Ex. 72). Despite providing notice to Julian at the correct address in those instances, Raul sent the Demand Letter to Julian's address in Los Angeles, California, which was listed in the Operating Agreement from June 5, 1998. (Def.'s Exs. 2, 4). Defendants contend that this letter constituted "written notice" under the terms of section 3.2 of the Operating Agreement and that Julian had 10 days to respond to this request for capital contributions.[6] The Court finds, however, that Raul knew the letter would not reach Julian because Raul was aware that Julian no longer resided at the Los Angeles address. Consequently, as Raul intended, Julian never received the Demand Letter and never remitted any money to Raul. (*See* Def.'s Ex. 72).

Second, the Demand Letter did not particularly describe the charges for services or capital contributions Julian allegedly owed at that time and did not account for the capital contributions provided by Julian at the formation of the company. Instead, Raul stated in the letter that he had "incurred out-of-pocket expenses of over $8,500, tax debt of more than $5,000 exists, and [he had] not been paid one cent for [his] services." (Def.'s Ex. 4). Raul then demanded that Julian remit $6,750 to him personally, plus an amount "equal to the fair value of

---

[6] Section 3.2 of the operating agreement stated that any member who fails to "make capital contributions to the Company as required hereunder shall be required to withdraw or resign as a Member upon ten (10) days written notice from . . . other members detailing the . . . services or capital contributions . . . . [S]uch withdrawal . . . shall be deemed automatic unless such services or capital contributions are satisfied during the ten-day period . . . . [S]uch Member shall thereafter only have the rights of a transferee as described in Section 6.3." Section 6.3 provided that a transferee without prior approval of the Members holds only an economic non-participatory interest in the company.

my services," which he described as several hundred hours at a rate of $250 per hour.[7] The Demand Letter was neither a legitimate demand for capital contributions nor an accounting of the company's expenses; rather, it was merely a pretext in Raul's scheme to defraud ARF and its interest holders for his own benefit.

### C. Transfer of Royalty Rights from ARF to Segundo Suenos

On June 3, 2005, Raul transferred all of ARF's royalty rights to Segundo Suenos by way of a three-page document titled "Agreement of Assignment and Transfer of Assets of Artist Rights Foundation, LLC, (California)." (Def.'s Ex. 23). At the time of the transfer, Segundo Suenos was not organized as a business entity under the laws of any state. On September 28, 2005, over three months after the transfer, Raul assisted his father in filing the documents required to establish Segundo Suenos as a Texas LLC. (Pl.'s Ex. 9). Raul did not inform Debtor or Julian of the transfer or otherwise obtain their consent to make the transfer. The terms of the transfer purportedly obligated Alfredo and Segundo Suenos to pay the liabilities that Raul recited in the Demand Letter: Raul's out-of-pocket expenses, expenses for Raul's "services," and the past-due California franchise taxes.

Following the transfer, the Ohio Players' royalties soon began to generate a substantial amount of revenue. From the time of the transfer until the time of trial, Segundo Suenos' gross revenue from the royalties totaled nearly one million dollars, and Defendants received all of the money. Debtor received no share of the profits, despite her ownership interest in ARF.

In this scheme, devised by Raul, Alfredo was a mere straw man, while Raul had full knowledge of the fraudulent nature of his actions. The Court finds that Raul intended to defraud

---

[7] Raul made no such demand upon Debtor and did not contribute any personal funds for his proportionate share of the expenses and taxes.

Debtor by transferring the royalty rights from ARF to Segundo Suenos—an LLC purportedly owned by Alfredo, an insider—for no consideration.

### D.    Raul wrongfully dissolved ARF.

After making the transfer, Raul wrongfully dissolved ARF by filing a Certificate of Cancellation with the California Secretary of State on December 27, 2006. (Def.'s Ex. 5). Raul's dissolution was wrongful because ARF's Articles of Organization and the Operating Agreement provided that dissolution of the company would occur under specific conditions.[8] (Def.'s Exs. 1, 2). None of those conditions were met when Raul dissolved ARF.[9]

Also, because Raul wrongfully dissolved ARF without notice to Julian, there was no winding up of its affairs as contemplated by the Operating Agreement. (Def.'s Ex. 2). As a result of Raul's wrongful dissolution, ARF ceased its active existence as an LLC, and the assets of ARF devolved to the individual owners of the company. (ECF No. 344).

### E.    Income Generated by the Ohio Players' Royalties

Raul testified that the total income generated by the Ohio Players' royalties was $988,000, which included revenue from royalties owned by ARF, a one-time sale of royalties to Bridgeport Music, Inc., dividend and interest income, and contributions by Alfredo, the ostensible owner of Segundo Suenos. (Trial Tr., 49, Feb. 23, 2010). Alfredo testified that Segundo Suenos received $998,000 from the rights during that time period. (Trial Tr., 237, Feb. 23, 2010). A twelve-page document titled "Segundo Suenos Income/Expenses (from

---

[8] The Operating Agreement provided that dissolution would occur upon the death, withdrawal, resignation, retirement, insanity, bankruptcy, or dissolution of any member. (Def.'s Ex. 2). It continued to define certain conditions of dissolution, which included: (1) the aforementioned events; (2) the entry of a decree of judicial dissolution pursuant to the California Corporate Code; (3) a vote of members holding at least 51% of the membership interests; or (4) the sale of all or substantially all of ARF's assets. *Id.*

[9] The purported transfer from ARF to Segundo Suenos did not constitute the sale of all or substantially all of the company's assets because the Operating Agreement did not authorize the transfer without approval of the majority of membership interests, and Raul did not provide notice to Julian, whose vote was required for approval of the transfer. Because Debtor's membership interest in ARF at that time was economic only, she did not have the voting rights necessary to approve or disapprove a sale of ARF's assets. (Def.'s Ex. 2).

inception thru 12-1-09)" (the "Expense Report") listed $968,529.17 as the total revenue received by Segundo Suenos from the royalties, dividend income of $401.91, and interest income of $386.85. (Pl.'s Ex. 14A; Def.'s Ex. 49). In light of the conflicting evidence, the Expense Report is the most reliable indicator of the revenue received by Segundo Suenos. From the Expense Report, the Court finds the total value of the royalties was $969,317.93, as evidenced by the income the royalties generated for Segundo Suenos, including interest and dividend income. *See Id.*

## F.    Expenses of ARF

The Court examined ARF's tax liabilities and Segundo Suenos' Expense Report to determine Debtor's portion of total expenses. Raul argued that the Court improperly disregarded evidence of $694,642.57 in expenses that should have been factored into the valuation of the royalties.[10] The Court reviewed the Expense Report to determine whether the value of the royalties should be reduced, based on the expenses incurred by ARF or Segundo Suenos.

Importantly, ARF was a California LLC owned by Julian, Raul, and Debtor, while Segundo Suenos is a Texas LLC owned by Alfredo. Thus, ARF was a wholly distinct entity from Segundo Suenos and was not liable for the debts, liabilities, or obligations incurred by Segundo Suenos.

### 1.    Franchise Tax Liabilities

From 1998 until 2002, Raul and Julian were the sole members of ARF, each with a one-half ownership interest in the company. After Raul and Debtor divorced in 2002, Julian maintained his 50% interest, but Raul's interest was reduced to 25%, and Debtor gained a 25% economic-only interest in ARF. In order to accurately determine Debtor's portion of the tax

---

[10] For the same reasons the Court relied on the Expense Report to determine revenue, the Court also looks to the Expense Report to determine expenses. The Expense Report lists the total expenses of Segundo Suenos at $694,642.57. (Def.'s Ex. 49).

liability, the Court calculated the tax liability from 2003 to 2005, when Debtor had an interest in ARF.

Two letters from Raul to the California Franchise Tax Board on behalf of ARF purport to include payment of past-due franchise taxes from 1998, the year ARF was registered as an LLC, through 2005, the year of the transfer of royalties. Yet the letters did not evidence actual payment. (Def.'s Exs. 61, 63). Two bank account statements for Segundo Suenos, however, reflect payments of $9,376 and $1,508.05 to the California Franchise Tax Board that match the amounts recited in the letters.[11] (Def.'s Exs. 62, 64). If the transfer had never occurred, ARF would have owed its unpaid California franchise taxes between 1998 and 2005. Segundo Suenos paid a total of $10,884.05 for ARF's tax liabilities between 1998 and 2005.

Still, there was insufficient evidence to determine the amount of tax liability incurred by ARF for each year between 1998 and 2005. The Court therefore calculated the yearly amount pro rata by dividing the total amount of unpaid taxes over the entire eight-year period from 1998 to 2005. Following this calculation, the yearly pro rata tax liability of ARF equals $1,360.51. Accordingly, the company incurred $4,081.52 in tax liability from 2003 to 2005. During this period, the Court finds Debtor is responsible for $1,020.38, in accordance with her 25% ownership interest in ARF.

### 2. Segundo Suenos' Expense Report

The Expense Report does not reflect any expenses that were incurred prior to the date of the transfer. (Def.'s Ex. 49). Segundo Suenos also did not regularly keep any profit and loss statements or balance sheets. (Trial Tr., 250-52, Feb. 25, 2010). Further, Defendants neither offered nor presented any evidence of invoices, receipts, work orders, or other documentation to

---

[11] The letters and bank account statements also reflect a payment for ARF's 2006 franchise taxes. No reduction in value should be applied from this payment because it was incurred after the date of the transfer of assets from ARF to Segundo Suenos. Therefore, the 2006 tax payment is outside of the scope of expenses that may equitably be attributed to ARF.

support or explain the transactions in the Expense Report. Hence, there was insufficient evidence to prove the existence, reasonableness, or necessity of the expenses in the Expense Report.

Defendants claim that a substantial portion of the revenue was used to pay legal fees incurred in obtaining the royalties. The Expense Report lists legal and professional fees totalling $331,968.38; however, Defendants presented no evidence that the legal fees were incurred to obtain the royalties. (Def.'s Ex. 49). Payments totaling $125,000 went to the law firm of Pick & Boydston. *Id*. Pick & Boydston represented Raul in a number of lawsuits, only one of which appears to be directly related to the acquisition of the royalties. *See Segundo Suenos, LLC v. Satchell*, Nos. B213178, B213251, 2009 WL 4646145 (Cal. Ct. App. 2d Dist. Dec. 9, 2009), *cert. denied*, 131 S. Ct. 164 (2010). Two other lawsuits in which Pick & Boydston represented Raul and one of his former business entities had nothing to do with the acquisition of the royalties. In *Galaz v. Jackson*, No. B184916, 2006 WL 648852 (Cal. Ct. App. 2d Dist. Mar. 1, 2006), Raul engaged Pick & Boydston to bring suit against Julian to enforce an illicit money laundering agreement in connection with royalties that Raul illegally acquired to the television show "Garfield and His Friends."[12] Further, in *Worldwide Subsidy Group v. Bogert*, No. B213979, 2009 WL 4609258 (Cal. Ct. App. 2d Dist. Dec. 8, 2009), one of Raul's former business entities retained Pick & Boydston to assert a legal malpractice action, which the court

---

[12]    Raul Galaz, having successfully defrauded owners of a television program of a large amount of royalty payments, entered into an illegal money-laundering contract with . . . Julian Jackson. Under their oral agreement, Galaz would give Julian $59,000 in illicit royalty proceeds, which Julian would place in an offshore bank account and return the funds in untraceable cash to Galaz, less a five percent commission for himself. Julian, however, eschewed the commission and kept the cash. Galaz, aggrieved to find so little honor among thieves, sued Julian for rescission and fraud.
    . . . .
    As our courts have long recognized, an illegal contract may not serve as the foundation of any action, either in law or in equity. This state's courts are not in the business of helping criminals recover the proceeds of their fraudulent schemes.

*Galaz*, 2006 WL 648852, at *1.

held was barred by the statute of limitations. In addition to the lack of evidence showing that these expenses were reasonable or necessary, the Expense Report failed to specifically identify the matters for which payments were made to Pick & Boydston. Moreover, by examining the time frame in which the fees were paid after the transfer between 2006 and 2009, in conjunction with entries showing payments to "James S. Wilk...," "Julian Walk...," "Clerk, U.S. Ba...," "Federal Court...," and "Pacer," it appears that a substantial portion of the revenues were used to pay for Raul's legal fees incurred in defending this lawsuit. (*See* ECF Nos. 67, 106).

The Expense Report also contains many other unproven categories of expenditures that were not reasonable or necessary for the generation of revenue. For example, the Expense Report lists $48,785.08 for "Auto" expenses, including $42,000 spent on a Hummer sport utility vehicle for Raul's personal use, $79.40 to register the Hummer, $2,568.42 for service on the Hummer, $820 for car washes at the "Wash Tub," and $1,843.26 in fuel. (Def.'s Ex. 49). The Expense Report also reveals that Raul paid himself $48,619.22 in "Consulting Fees" and that he spent $174.70 on "Dining" for meals at Outback Steakhouse, Carrabba's, and Fatty's. *Id*. A total of $77,155.16 was paid in "Rent" to Ruth Galaz, who is Raul's mother, and Shantell Sloan, who is Raul's wife. It is unclear whether this rent was for personal or commercial use; nevertheless, Defendants did not establish the legitimacy of these expenses. The Expense Report further reveals expenses of $12,124.73 on "Travel," $10,000 on a loan to "Amado Ramos Phone Cente...," and a number of transfers made between multiple accounts at multiple banks.

Defendants also argue that the Court should consider the $420,000 that Raul allegedly incurred for legal services he provided to ARF. The Court does not consider these purported expenses because Defendants failed to present any contemporaneous evidence specifically showing what services Raul provided, whether those services were provided before or after the

transfer, or whether they were reasonable or necessary.[13] At no point in time did Raul ever present any bills to ARF for his legal services. (Trial Tr., 217, Feb. 25, 2010).

The Court therefore finds that value of the royalties should not be reduced based on expenses listed in the Expense Report.

### G.      Litigation in California State Court

Prior to this controversy, Segundo Suenos filed suit in California against some of the Ohio Players' heirs, asserting its rights to the royalties that ARF allegedly transferred to Segundo Suenos. The California court denied the requested relief, finding that Segundo Suenos lacked standing because it failed to prove a valid transfer of the rights from ARF. Segundo Suenos appealed the judgment, and the appellate court affirmed the trial court's decision. *Satchell*, 2009 WL 4646145, at *1. Specifically, the California courts held that the transfer failed to comply with United States copyright law and was therefore invalid and unenforceable. Through both the trial and appellate process, the Court finds that Defendants had a full and fair opportunity to litigate the validity of the transfer of the rights in the California courts. Further, Defendants were aware and should reasonably have expected that they would be bound by the California court's determination that the transfer was invalid.

## III.     Proposed Conclusions of Law

### A.      Jurisdiction and Legal Issues Following Remand by the Fifth Circuit

Because Debtor's TUFTA "claim is 'related to a case under title 11,' 28 U.S.C. § 157(c)(1), the bankruptcy court may still hear it and 'submit proposed findings of fact and conclusions of law to the district court for *de novo* review and entry of judgment.'" *Galaz*, 765

---

[13] Further, due to a felony conviction for mail fraud, Raul resigned from the State Bar of California on June 3, 2002, and was formally disbarred in 2007. Raul was not a licensed attorney during much of the time he claimed to be providing legal services to ARF. Raul would not be entitled to any fees for legal services after he forfeited his license in 2002. (Pl.'s Ex. 12); s*ee Cruse v. O'Quinn*, 273 S.W.3d 766, 772 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

F.3d at 432 (citing *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2173-74 (2014)).

Additionally, for the same reasons the Fifth Circuit vacated this Court's judgment over Julian's counterclaims, Defendants' claims against Julian should be dismissed for lack of subject matter jurisdiction, and Julian should be dismissed as a party in this case. *See Galaz*, 765 F.3d at 429-31.

Four primary issues are now before the Court: (1) whether the transfer of the royalty rights from ARF to Segundo Suenos was valid; (2) whether Raul breached a fiduciary duty to Debtor; (3) whether Defendants' disposition of the monies generated through exploitation of the royalty rights was a fraudulent transfer as to Debtor; and (4) appropriate remedies and damages.

### B.       Raul's transfer of royalty rights from ARF to Segundo Suenos was invalid.

Debtor argues that the transfer of royalty rights from ARF to Segundo Suenos was invalid for three reasons: (1) Raul lacked authority to unilaterally make the transfer; (2) the doctrine of collateral estoppel compels the Court to recognize the transfer as invalid because the matter was previously litigated in a court of competent jurisdiction, and that court determined the transfer was invalid; and (3) the transfer of rights was a fraudulent transfer. The Court agrees with the arguments set forth by Debtor and, for the reasons below, concludes that Raul's transfer of royalty rights from ARF to Segundo Suenos was invalid. The Court separately addresses whether the transfer of rights was a fraudulent transfer in Part III.D below.

### 1.       Raul lacked authority to make the transfer.

Debtor argues that Raul lacked the authority to transfer substantially all of the assets of ARF to Segundo Suenos. In response, Defendants claim that Raul was the sole full member of ARF remaining at the time of the transfer because Julian did not respond to the Demand Letter or remit to Raul his share of the monies necessary to cover the company's expenses and taxes.

Defendants therefore claim that Raul, as the sole managing member of ARF, had authority to make the transfer without notice to, or consent from, Julian. The Court concludes otherwise.

ARF was organized under the laws of California. A California LLC's members or managers may manage the business and affairs of the LLC. *See* CAL. CORP. CODE § 17704.07 (West 2014) (replacing CAL. CORP. CODE § 17150 (effective to Dec. 31, 2013)). ARF's articles of organization stated that its members would manage the LLC. Further, the Operating Agreement stated:

> [T]he intent of each Member is to actively engage in the management of the Company. Accordingly, unless otherwise limited by the Articles or this Agreement, each Member shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

(Def.'s Ex. 2 § 4.1). Members of ARF, therefore, had full authority to manage and control the company's business and property. The next section of the Operating Agreement, however, contained a limitation on the authority of members. (Def.'s Ex. 2 § 4.2). The limitations clause stated:

> [N]o member shall have authority to cause the Company to engage in the following transactions without first obtaining the approval of Members holding a majority of the Membership interests: (i) The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan
>  . . . .

*Id*. The rights to the Ohio Players' royalties constituted substantially all of ARF's assets. Looking solely to the LLC documents, the members had authority to sell company property, but the Operating Agreement also required that any member seeking to transfer substantially all of

ARF's assets had to first obtain the approval of members holding a majority of the membership interests in ARF.

Debtor claims Raul lacked majority approval in disposing of substantially all of ARF's assets because he did not obtain her approval or Julian's approval. Defendants counter that Julian was stripped of his status as a full member of ARF because he failed to respond to the Demand Letter and contribute his share of the corporate expenses and taxes. Further, Defendants argue that Debtor was never a voting member because she had only an economic interest in ARF.

As discussed in this Court's findings above, because Debtor held only an economic interest in ARF, Debtor was not entitled to vote or participate in management. Thus, the Court agrees with Defendants that Raul did not need Debtor's consent to transfer substantially all of ARF's assets to Segundo Suenos. The Court also found, however, that the Demand Letter was insufficient to terminate Julian's membership interest in ARF. Thus, Julian was a full member of ARF, with voting and management rights, at the time of the transfer to Segundo Suenos. Accordingly, Raul needed Julian's approval to transfer the Ohio Players' royalty rights to Segundo Suenos. Raul did not obtain Julian's approval to make the transfer. The Court therefore concludes the transfer is void and unenforceable.

### 2. Defendants are collaterally estopped from claiming the transfer is valid.

Federal courts must apply the same preclusive effect to state court judgments as state courts would apply. *Allen v. McCurry*, 449 U.S. 90, 95-96 (1980) (citing 28 U.S.C. § 1738); *Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 193 (1941); *Davis v. Davis*, 305 U.S. 32, 39-40 (1938). California courts traditionally apply the doctrine of collateral estoppel if five threshold elements are met: (1) the issue sought to be precluded is identical to that previously decided; (2) the issue was actually litigated; (3) the issue was necessarily

decided; (4) the decision in the previous litigation was final and on the merits; and (5) the party against whom preclusion is sought is the same or in privity with the party from the prior proceeding. ***Hernandez v. City of Pomona***, 207 P.3d 506, 511 (Cal. 2009) (citing ***Lucido v. Superior Court***, 795 P.2d 1223, 1225 (Cal. 1990)).

The issue Debtor seeks to preclude—whether the transfer of the royalty rights from ARF to Segundo Suenos was valid—is identical to the issue tried by the California court in the prior lawsuit. The issue was actually litigated. The appellate court in the prior action noted in its decision that the trial was reopened for the specific purpose of giving Segundo Suenos an opportunity to present further evidence to prove the assignment. After reopening, Segundo Suenos failed to prove the validity of the transfer of the royalty rights. The decision of the trial court was based on the merits, is final, and was upheld on appeal. Finally, Segundo Suenos is the same party in both actions. ***Satchell***, 2009 WL 4646145, at *2-3.

To determine whether the issue was actually litigated, the Court must also "consider whether the party against whom the earlier decision is asserted had a 'full and fair' opportunity to litigate the issue." ***Nein v. HostPro, Inc.***, 95 Cal. Rptr. 3d 34, 44-45 (Ct. App. 2d Dist. 2009) (quoting ***Roos v. Red***, 30 Cal. Rptr. 3d 446, 452 (Ct. App. 2d Dist. 2005)). Further, "[i]n the context of collateral estoppel . . . the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication." ***Nein***, 95 Cal. Rptr. 3d at 45 (citations omitted).

Through both the trial and appellate process, as discussed in the Court's findings above, Defendants had a full and fair opportunity to litigate the validity of the transfer of the royalty rights in the California courts. Second, Defendants should reasonably have expected to be bound by the prior adjudication. In California, the court had to determine whether Segundo Suenos, as the plaintiff, had standing to bring the suit. To decide whether Segundo Suenos had standing, the

court had to determine whether the transfer was valid. By bringing the suit, requesting and receiving a reopening of the case, and later appealing the decision, Defendants were aware and should reasonably have expected that they would be bound by the California court's determination that the transfer was invalid.

The California court's final judgment collaterally estops the Defendants from claiming that the transfer of royalty rights from ARF to Segundo Suenos was valid. Even if the Defendants were not so estopped, the evidence presented at trial shows that Raul lacked the authority to transfer substantially all of ARF's assets at the time of the purported transfer. Thus, the royalty rights were not validly transferred by ARF, and Debtor retained a 25% interest in the assets of ARF.

**C. Raul did not breach a fiduciary duty to Debtor because Debtor held only an economic interest in ARF.**

As a manager of ARF, Raul owed a fiduciary duty to the LLC and its members. CAL. CORP. CODE § 17704.09 (replacing CAL. CORP. CODE § 17153 (effective to Dec. 31, 2013)). Because, under the California LLC statute, the fiduciary relationship between members of an LLC is the same as that between partners in a partnership, the Court looks to partnership case law to determine whether Raul owed a fiduciary duty to Debtor. "[C]ourts in . . . California have ruled that an assignment of a partnership interest does not bring the transferee into a fiduciary relationship with the remaining partners." *Griffin v. Box*, 910 F.2d 255, 261 (5th Cir. 1990) (citing *Kellis v. Ring*, 155 Cal. Rptr. 297, 299-300 (Ct. App. 2d Dist. 1979); *accord Bookstein v. Gross*, No. B167486, 2004 WL 2439589, at *6 (Cal. Ct. App. 2d Dist. Nov. 2, 2004) ("[T]he limits placed on partnership assignees prevent an assignee from maintaining an action against a general partner for breach of fiduciary duty."). Thus, because Debtor held only an economic interest in—and was not a member of—ARF, Raul did not owe Debtor a fiduciary duty.

18

**D.  The transfer to Segundo Suenos was a fraudulent transfer under TUFTA.**

The Court concludes that the transfer of royalties from ARF to Segundo Suenos was a fraudulent transfer under TUFTA, and should be set aside. *See* TEX. BUS. & COM. CODE ANN. § 24.005(a) (West 2014). A number of the "badges of fraud" listed in section 24.005(b), which show actual intent to defraud, were present at the time of the transfer and are the basis for strong inferences of fraud. *See Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008) ("Not all, or even a majority, of the 'badges of fraud' must exist to find actual fraud. Indeed, '[w]here several of these indicia of fraud are found, they can be a proper basis for an inference of fraud.'" (quoting *Roland v. United States*, 838 F.2d 1400, 1403 (5th Cir. 1988))).

**E.  Damages**

For the reasons set forth below, Debtor is entitled to an award of $241,309.10 in actual damages. Further, the circumstances surrounding Defendants' conduct were sufficiently egregious to compel an award of $250,000.00 in exemplary damages. Thus, the Court concludes Debtor is entitled to $491,309.10 in total damages.

**1.  Actual Damages Based on the Value of the Ohio Players' Royalties**

TUFTA creates a statutory cause of action through which a creditor may seek recourse for a fraudulent transfer. *See* TEX. BUS. & COM. CODE ANN. § 24.005. TUFTA authorizes both equitable relief, through the avoidance of a fraudulent transfer, and money damages up to the value of the property transferred. *Wohlstein v. Aliezer*, 321 S.W.3d 765, 776 (Tex. App.– Houston [14th Dist.] 2010, no pet.) (citing *Chu v. Hong*, 249 S.W.3d 441, 446 (Tex. 2008)). Specifically, the remedies for a fraudulent transfer under TUFTA include: (1) avoidance of the transfer to the extent necessary to satisfy the creditor's claim; (2) an attachment or other provisional remedy; (3) other equitable remedies such as injunctions or the appointment of receivers; or (4) any other relief that the circumstances may require. TEX. BUS. & COM. CODE

19

ANN. § 24.008(a); *Airflow Houston, Inc. v. Theriot*, 849 S.W.2d 928, 933–34 (Tex. App.–Houston [1st Dist.] 1993, no writ). "The last option is quite broad." *Airflow*, 849 S.W.2d at 934.

Debtor is entitled to relief in the amount of the value taken by Defendants to restore Debtor's position as if the fraudulent transfer had never occurred.[14] *See Asarco LLC v. Ams. Mining Corp*., 404 B.R. 150, 170–73 (S.D. Tex. 2009) (stating that the court can award an amount of damages necessary to put a claimant in the financial condition in which it would have been before the fraudulent transfer took place). A court has wide discretion to approximate the value that a claimant has lost as a result of a defendant's fraudulent transfer of assets. *See West v. Hsu* (*In re Advanced Modular Power Sys*.), 413 B.R. 643, 678 (Bankr. S.D. Tex. 2009) (citing *Asarco*, 404 B.R. at 162) (stating that it is within the discretion of the court to award relief in the amount of value taken by a defendant). In awarding damages based upon the value of the asset transferred, a court may adjust the award "as the equities may require." TEX. BUS. & COM. CODE ANN. § 24.009(c)(1). With these principles in mind, the Court will determine the amount of value lost by Debtor, adjusted equitably according to the circumstances of the case.

Because Debtor lost the benefit of her ownership interest from June 2005 until November 2010 as a result of the fraudulent transfer, she is entitled to her proportionate share of the $969,317.93 in gross income generated by the royalties during that period of time. Based on that calculation, Debtor's share of the revenue totals $242,329.48, less allowable expenses. This amount is the starting point to determine the amount of value that Debtor was deprived of as a result of the fraudulent transfer.

As discussed in the Court's findings above, because the Expense Report reveals expenses incurred by Segundo Suenos—a wholly distinct entity formed for the purpose of defrauding

---

[14] Because the assets of ARF have devolved to the individual owners of the LLC, any relief granted will be to the owners of ARF in their individual capacities.

Debtor of her share of revenue—the royalties' value is not reduced by the expenses of Segundo Suenos in the Expense Report. *See Advanced Modular Power Sys.*, 413 B.R. 643, 679 (Bankr. S.D. Tex. 2009) (declining to reduce damage award in breach of fiduciary duty and fraudulent transfer case where doing so would reward wrongdoers for their actions). Moreover, the existence of a number of illegitimate expenses in the Expense Report renders reliability of those expenses tenuous, at best. The Court thus declines to consider these expenses—to do otherwise would give indirect countenance to Defendants' improper conduct. *See* TEX. BUS. & COM. CODE ANN. § 24.009(c)(1) (damage award for value of property transferred "subject to adjustment as the equities may require").

Still, Debtor should be responsible for her proportionate share of reasonable and necessary expenses that were incurred by ARF prior to the date of the transfer. The members of ARF are liable for their share of ARF's unpaid franchise taxes prior to the transfer. As reflected in the Court's findings above, between 2003 and 2005, Debtor was responsible for $1,020.38 in unpaid franchise taxes.

Thus, after subtracting Debtor's share of tax liability prior to the transfer, the Court concludes that Debtor is entitled to actual damages of $241,309.10.

### 2.       Exemplary Damages Based on Fraud, Malice, and Gross Negligence

"A bankruptcy court may rely on state law to award exemplary damages where the Bankruptcy Code does not specifically allow such measures." *Franklin Bank, S.S.B. v. Barnes* (*In re Barnes*), 369 B.R. 298, 310 (Bankr. W.D. Tex. 2007). Under Texas law, courts of equity have the power to assess exemplary damages, and, as such, a bankruptcy court may assess exemplary damages where state law supports such an award. *Id*. Furthermore, exemplary damages are proper in order "to punish the defendant for outrageous, malicious, or otherwise morally culpable conduct." *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 16 (Tex. 1994). In

addition to punishing a wrongdoer, exemplary damages serve to deter others from engaging in similar conduct. ***Owens-Corning Fiberglas Corp. v. Malone***, 972 S.W.2d 35, 40 (Tex. 1998).

"Exemplary damages may be awarded only where the plaintiff proves by clear and convincing evidence that the loss or injury results from: (1) fraud; (2) malice; or (3) gross negligence." ***In re Barnes***, 369 B.R. at 310 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 41.003 (Vernon Supp. 2007)). "'Fraud' means fraud other than constructive fraud." TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(6) (West 2014). "'Malice' means a specific intent by the defendant to cause substantial injury or harm to the claimant." TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7). Specific intent means that "the actor desires to cause the consequences of his act, or that he believes the consequences are substantially certain to result from it." ***Mission Res., Inc. v. Garza Energy Trust***, 166 S.W.3d 301, 314 (Tex. App.–Corpus Christi 2005), *rev'd on other grounds*, 268 S.W.3d 1 (Tex. 2008). Further, "gross negligence" is defined as an act or omission:

> (A)    which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (B)    of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11).

Based upon the evidence presented at trial, Debtor proved she was harmed by the Defendants' acts of gross negligence, malice, and fraud in connection with the fraudulent transfer of assets from ARF to Segundo Suenos. For that reason, the circumstances of this case compel an award of exemplary damages.

### a. Fraud and Malice in Connection with the Fraudulent Transfer

In accordance with section 41.003 of the Texas Civil Practice and Remedies Code and section 24.005(a) of TUFTA, Raul's conduct constituted acts of fraud and malice because he made the transfer to Segundo Suenos with the actual intent to hinder, delay, and defraud Debtor. *See* TEX. BUS. & COM. CODE ANN. § 24.005(a) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor."). Because Raul acted with the intent to defraud, the transfer of assets from ARF to Segundo Suenos constituted fraud under TUFTA. Furthermore, Raul acted with malice because he acted with a specific intent to defraud Debtor of her share of revenue from the Royalties and of her interest in the Royalties themselves. Therefore, an award of exemplary damages is proper in light of Raul's violation of TUFTA.

### b. Assessment of Exemplary Damages

Under Texas law, exemplary damages are capped at the greater of: "(1)(A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the [fact finder], not to exceed $750,000.00; or (2) $200,000.00." TEX. CIV. PRAC. & REM. CODE ANN. § 41.008. "The amount awarded must be reasonably proportional to actual damages, though no set ratio exists for measuring reasonableness.*" Smith v. Lounsbury* (*In re Amberjack Interests, Inc*.), 326 B.R. 379, 393 (Bankr. S.D. Tex. 2005) (citing *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981)). The Court weighs the following six factors to determine the reasonableness of an award: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant. TEX. CIV. PRAC. & REM. CODE ANN.

§ 41.011(a); *In re Amberjack Interests*, 326 B.R. at 393 (citing **Kraus**, 616 S.W.2d at 910). Exemplary damages awarded by the Court are "presumptively reasonable" if the award is within the statutory limits. *In re Amberjack Interests*, 326 B.R. at 393 (citing **Peco Constr. Co. v. Guajardo**, 919 S.W.2d 736, 742 (Tex. App.–San Antonio 1996, writ denied)).

The Court assesses an exemplary damage award of $250,000 in favor of Debtor. This figure represents significantly less than a doubling of the award of actual damages. Because the award of exemplary damages is within the statutory limits, the award of exemplary damages is reasonable under Texas law. Further, after a careful review of the circumstances surrounding the nature of the wrong, the character of the Defendants' conduct, the degree of the Defendants' culpability, the situation and sensibilities of the parties, and the extent to which the Defendants' conduct offends a public sense of justice and propriety, the award of exemplary damages is modest and reasonable under the factors set forth in section 41.011(a) of the Texas Civil Practice and Remedies Code. *See In re Amberjack Interests*, 326 B.R. at 393 (citing **Kraus**, 616 S.W.2d at 910). The actions perpetrated by the Defendants were sufficiently malicious to justify an award of exemplary damages and such an award is necessary to deter Raul and others from engaging in similar conduct in the future.

## IV.   Conclusion

In accordance with the Court's findings of fact and conclusions of law, Debtor should be awarded $491,309.10 in damages. All proceeds attributable to Raul's interest should be paid to Debtor until her damage award is satisfied. Also, Debtor should be awarded costs of court and attorney's fees for a successful action under TUFTA. *See* TEX. BUS. & COM. CODE ANN. § 24.013.

Further, the preliminary injunction previously granted in favor of Debtor on May 9, 2008, in this adversary proceeding should be made permanent. Defendants should not spend, dissipate,

or transfer any funds or assets of Segundo Suenos. Defendants should also turn over Debtor's portion of such assets and evidence of their ownership to Debtor, as a co-owner of the royalties.

To the extent that any findings of fact may be construed as conclusions of law, the District Court may adopt them as such. Likewise, to the extent that any conclusions of law constitute findings of fact, the District Court may adopt them as such. A proposed Judgment is attached herewith.

### ###

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | NO. SA-15-CA-_____ |
| | § | |
| LISA ANN GALAZ, | § | CASE NO. 07-53287-RBK |
| | § | |
| DEBTOR | § | CHAPTER 13 |
| _____ | § | |
| | § | |
| LISA ANN GALAZ | § | |
| | § | |
| VS. | § | ADVERSARY NO. 08-5043-RBK |
| | § | |
| RAUL GALAZ, ALFREDO GALAZ, | § | |
| SEGUNDO SUENOS, LLC | § | |

JUDGMENT

On February 22, 2010, came on to be heard the above-styled adversary proceeding for trial on the merits before the Bankruptcy Court.  The parties, Lisa Galaz, Raul Galaz, Alfredo Galaz, Segundo Suenos, LLC, and Julian Jackson appeared and announced ready.  After reviewing the evidence and argument of the parties *de novo*, the Court is of the opinion that judgment should be rendered in favor of Lisa Galaz against Raul Galaz, Alfredo Galaz, and Segundo Suenos, LLC, as provided in the decretal portions of this Judgment, for the reasons stated in the Proposed Findings of Fact and Conclusions of Law, which are accepted and adopted by this Court, pursuant to Rule 9033(d) of the Federal Rules of Bankruptcy Procedure.

It is, therefore, **ORDERED, ADJUDGED, AND DECREED** that Plaintiff, Lisa Galaz, recover the amount of $491,309.10 of and from Raul Galaz and Segundo Suenos, LLC, jointly and severally; $241,309.10 as actual damages, plus the sum of $250,000 as exemplary damages, for a total of $491,309.10.

It is further **ORDERED, ADJUDGED, AND DECREED** that all claims and causes of action by or against Julian Jackson are hereby dismissed for lack of jurisdiction.

It is further **ORDERED, ADJUDGED, AND DECREED** that all royalty and other rights to the music of the Ohio Players previously owned by Artist Rights Foundation, LLC, or Segundo Suenos, LLC, shall be owned 50 percent by Julian Jackson; 25 percent by Lisa Galaz; and 25 percent by Raul Galaz; provided, however, that all proceeds attributable to Raul Galaz's 25 percent share shall be paid to Lisa Galaz until the actual and exemplary damages awarded in this Judgment are satisfied.

It is further **ORDERED, ADJUDGED, AND DECREED** that the preliminary injunction previously granted in this adversary proceeding will be made permanent.  Defendants, Raul Galaz, Alfredo Galaz, and Segundo Suenos, LLC, are **ORDERED** not to spend, dissipate or transfer any funds or assets of Segundo Suenos, LLC.  In addition, Defendants are **ORDERED**, within ten days, to turn over all such assets, records, and evidence of their ownership to Lisa Galaz as co-owner of the royalties and other assets.  The Court also hereby **ORDERS** Raul Galaz, Segundo Suenos, Alfredo Carlos Galaz, and anyone acting in active concert with any of them with knowledge of this Preliminary Injunction not to dismiss, compromise, settle, assign, or in any way prejudice any of the rights, claims or litigation of Segundo Suenos, including specifically (but without limitation) any right or claim asserted by Segundo Suenos in any of the following civil actions:

1.  Case No. BC366409; *Segundo Suenos, LLC v. Warner-Chappell Music, Inc., et al.*, in the Superior Court of the State of California, County of Los Angeles, Central Division.

2.  Case No. BC358422 and/or BC355571; *Segundo Suenos, LLC v. Tracy Draper et al. and/or Ray Gaddis, et al.*, in the Superior Court of the State of California, County of Los Angeles, Central Division.

The rights, claims, litigation, and all records thereof shall be turned over to Lisa Galaz.  Any failure to comply with this Judgment will be punishable by contempt.

2

Costs of court are taxed against Raul Galaz, for which execution shall issue.  Lisa Galaz is awarded attorney's fees of $162,989.00, plus $2,600.00 for post remand fees, for a successful action under TUFTA.  TEX. BUS. & COMM. CODE § 24.013 (West 2009).

Any relief not specifically granted herein is denied.

Signed this _____ day of _____, 2015.

_____
United States District Judge

# # #

3